IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CEMENT MASONS & PLASTERERS JOINT PENSION TRUST, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> EQUINIX, INC., STEPHEN M. SMITH, and KEITH TAYLOR, <br><br> Defendants. | Case No. 11-01016 SC <br><br> ORDER GRANTING MOTION TO DISMISS |

## I.   INTRODUCTION

Plaintiffs Cement Masons & Plasterers Joint Pension Trust ("Cement Masons") and the International Brotherhood of Electrical Workers Local 697 Pension Fund ("IBEW") (collectively, "Plaintiffs") bring this putative securities class action against Equinix, Inc. ("Equinix"), and Equinix's CEO, Stephen M. Smith ("Smith"), and CFO, Keith D. Taylor ("Taylor") (collectively, "Defendants").  Plaintiffs assert that the price of Equinix stock was artificially inflated between July 29, 2010 and October 5, 2010 ("the Class Period") due to allegedly false and misleading statements made by Defendants, and that Equinix's stock price plummeted over 33 percent when the falsity of these statements was

revealed. Now before the Court is Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint ("FAC"). ECF No. 29 ("MTD"). The Motion is fully briefed. ECF Nos. 17 ("Opp'n"), 20 ("Reply"). Pursuant to Civil Local Rule 7-1(b), the Court finds the motion suitable for determination without oral argument. For the reasons set forth below, the Court GRANTS Defendants' Motion to Dismiss and DISMISSES the FAC WITH LEAVE TO AMEND.

**II.   BACKGROUND**

Equinix is a public corporation that provides carrier-neutral data centers and internet exchanges. ECF No. 26 ("FAC") ¶ 2. The Company connects businesses with partners and customers around the world through a global platform of high-performance data centers called International Business Exchanges ("IBXs"). Id. IBX data centers enable customers to safeguard their infrastructure, house their assets and applications closer to users, and collaborate with partners and customers. Id. Equinix generates substantially all of its revenue through three offerings available to customers at its ninety-two IBX data centers: collocation services, interconnection services, managed IT services. Id. ¶ 4. These services provide customers with shared, equipped facilities for their computer and data systems. See id. ¶¶ 5-7.

Equinix acquired Switch and Data, one of its competitors, during the second quarter of 2010. Id. ¶ 8. Equinix's overall financial results for that quarter were positive. On July 28, 2010, the day before the commencement of the Class Period, the Company issued a press release announcing that it had posted its thirtieth consecutive quarter of sequential growth, reporting

revenues of $296.1 million.  Id. ¶¶ 8, 48.  In the same release, Equinix offered financial projections for the third quarter 2010 ("3Q10") and fiscal year 2010 ("FY10").  Id. ¶ 48.  Equinix forecasted 3Q10 revenue of $335 to $338 million and FY10 revenue of $1.225 to $1.235 billion (the "July 28 guidance").  Id.  Adjusted EBITDA[1] for FY10 was expected to be between $535 and $540 million.  Id.

Also on July 28, 2010, Defendants made a number of statements concerning Equinix's pricing strategy and the integration of Switch and Data.  On a conference call, responding to investor questions about whether Equinix could maintain its firm pricing in the face of an increasingly competitive environment, Smith commented: "We're not going to go below a threshold," id. ¶ 36; and "[w]e're maintaining the discipline on the floors and ceilings we have on our pricing and the sales force is staying very, very disciplined on price," id. ¶ 51.  Smith conceded that there would be certain exceptions to this stable pricing strategy: "[I]n certain markets we're going to get some pricing pressure on certain deals.  If it's a strategic deal and it's a magnetic deal for us, we'll get more aggressive."  Id. ¶ 51.  As to Switch and Data, Defendants offered a positive assessment of the company's integration into Equinix.  In the July 28, 2010 press release, Equinix stated: "The integration of Switch and Data is ahead of schedule."  Id. ¶ 8.  During the July 28, 2010 conference call, Smith stated: "The sales organizations have been completely integrated with full cost

---

[1] Adjusted EBITDA is defined as income or loss from operations plus depreciation, amortization, accretion, stock-based compensation expense, restructuring charges, acquisition costs, and gains on asset sales.

3

synergies already achieved in the sales function." Id. ¶ 50. Taylor echoed this sentiment, stating: "We've got the sales forces cross-selling into both assets. They're all part of one team today . . . so the structure all the way up to the sales leader in North America has been in place for weeks now." Id.

Taylor spoke with investors again on September 15, 2010, echoing many of the statements from July 28, 2010. Commenting on the stability of Equinix's pricing, Taylor affirmed: "[W]e're not going to trade price for volume"; id. ¶ 65; and "this is sort of a consistent message you've heard from us previously, that pricing is stable, it's firm," id. ¶ 66. Taylor also stated: "I think as we look into 2011 on our Q3 earnings call, I think it's fair to assume that we are going to give out guidance. We have a high degree of confidence in our ability to do that." Id. ¶ 65.

Equinix had less positive news to report on October 5, 2010, the last day of the Class Period. Equinix announced in a press release that it now expected 3Q10 revenue of $328 to $330 million, a 2.2 percent reduction from the July 28 guidance, and FY10 revenue of 1.215 billion, a 1.2 percent reduction from the July 28 guidance. Id. ¶ 13. In a conference call with investors on the same day, Smith stated that the downward revision was due to an "understatement of churn" (i.e., customer attrition), lower than expected revenues related to the company's Switch and Data assets, and customer discounts that were not fully contemplated when Equinix offered the July 28 guidance. Id. ¶¶ 70-71. Smith explained:

> [W]e just had an assumption that was missed in the guidance. . . . Should've seen it in Q2. We caught it

4

>part way through. We wanted to see the September flash so we'd make darn sure we knew what the heck we were looking at. And that's why we decided to get that behind us, looking at the September flash and getting it out to you guys today.

Id. ¶ 71.

Smith also addressed Equinix's pricing strategy and the Switch and Data integration during the October 5, 2010 conference call. As to pricing, Smith stated: "[D]uring the second and third quarters, there were certain discounts and credit memos issued to a number of strategic customers." Id. ¶ 70. Smith elaborated that Equinix had adjusted prices "just over 10%" for two key "magnet" customers, id. ¶ 73, explaining that "if a large customer is willing to commit long term in large volume, we are going to get flexible in our pricing with them." Id. ¶ 74. With respect to the Switch and Data integration, Smith stated:

>We are five months into our integration plan, and we've been able to achieve cost synergy targets, resulting in a 7-point improvement to the Switch and Data adjusted EBITDA margins. . . . We still have work to do to realign the combined sales organizations, but our expectations are that we will see improvements in the utilization of the former Switch and Data assets as we exit 2010.

Id. ¶ 71.

Investors were apparently displeased with the October 5, 2010 announcements. Equinix's stock price fell from $106.09 on October 5 to $70.34 the next day, a one-day loss of over 33 percent of shareholder equity. Id. ¶ 17.

Cement Masons, which had purchased Equinix stock during the Class Period, filed the instant action in federal court on March 4, 2011. ECF No. 1 ("Compl."). IBEW, another Equinix stockholder

5

that is represented by the same counsel as Cement Masons, was appointed as lead plaintiff on August 8, 2011.  ECF No. 23 ("Aug. 8, 2011 Order").  The FAC was filed about six weeks later.  The FAC asserts causes of action for: (1) violations of Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act") and of United States Securities and Exchange Commission ("SEC") Rule 10b-5; and (2) violations of Section 20(a) of the Exchange Act.  FAC ¶¶ 93-98.  The crux of the FAC is that Defendants made a number of false and misleading statements concerning: (1) Equinix's financial forecasts for 3Q10 and FY10; (2) Equinix's pricing strategy; (3) the integration of Switch and Data's sales force; and (4) Equinix's ability to provide accurate financial forecasts.[2]  Plaintiffs allege that these false and misleading statements artificially inflated Equinix's stock price and that, when the truth was finally revealed, Equinix's stock price plummeted.

### III. LEGAL STANDARD

#### A. Motion to Dismiss

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988).  "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they

---

[2] The FAC also targets Defendants' statements concerning churn rates, see, e.g., FAC ¶ 52, but Plaintiffs appear to have abandoned those allegations in their opposition papers.

6

plausibly give rise to an entitlement to relief."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  The court's review is generally "limited to the complaint, materials incorporated into the complaint by reference, and matters of which the court may take judicial notice."  Metzler Inv. GMBH v. Corinthian Colls., Inc., 540 F.3d 1049, 1061 (9th Cir. 2008) (citing Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)).

### B.  Section 10(b)

Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe . . . ."  15 U.S.C. § 78j(b).  One such rule prescribed by the Commission is Rule 10b-5, which states that "[i]t shall be unlawful for any person . . . [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(c).  Plaintiffs must plead five elements to establish a violation of Rule 10b-5.  Specifically, Plaintiffs must demonstrate "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction

7

and loss causation, and (5) economic loss." In re Daou Sys., 411 F.3d 1006, 1014 (9th Cir. 2005).

Plaintiffs must also meet the heightened pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4.  The PSLRA requires plaintiffs to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1).  Additionally, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  Id. § 78u-4(b)(2).  The "required state of mind" for establishing securities fraud is the knowing, intentional, or deliberately reckless disclosure of false or misleading statements. See Daou, 411 F.3d at 1014-15.  "The stricter standard for pleading scienter naturally results in a stricter standard for pleading falsity, because falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, and the two requirements may be combined into a unitary inquiry under the PSLRA."  Id. at 1015 (internal quotation marks omitted).

**IV. DISCUSSION**

    **A. Plaintiffs' Section 10(b) Claim**

The Court finds that Plaintiffs' Section 10(b) claim fails because Plaintiffs have not alleged any actionable statements.  As set forth below, Defendants' July 28 financial forecasts are protected by the PSLRA safe harbor for forward-looking statements. Defendants' statements regarding Equinix's pricing strategy and the Switch and Data integration are not actionable because Plaintiff

8

has failed to plead that the statements were false. Taylor's statement regarding Equinix's ability to provide accurate financial guidance constitutes a non-actionable expression of corporate optimism. The Court also rejects Plaintiffs' argument that Defendants somehow violated a duty to correct the July 28 guidance. Additionally, Plaintiffs' theory of fraud is undermined by the fact that Smith and Taylor held onto their Equinix stock during the Class Period.

### 1. Financial Forecasts for 3Q10 and FY10

Plaintiffs allege that Defendants knew that Equinix would fail to meet its July 28 forecasts for 3Q10 and FY10 at the time the forecasts were made. These forecasts were revised by a few percentage points on October 5, purportedly because of an understated churn rate, lower than expected revenues from Switch and Data assets, and a failure to account for customer discounts and settlements. The Court finds that these forecasts are not actionable because they fall under the PSLRA safe harbor for forward-looking statements.

The PSLRA defines a forward-looking statement as "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items." 15 U.S.C. § 78u-5(i)(1). Such statements may fall within the safe harbor if: (A) they are "identified as forward-looking" and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement"; or (B) the plaintiff fails to prove the projections were made with "actual

knowledge" that they were false and misleading. Id. § 78u-5(c)(1)(A)-(B).  Thus, a defendant's state of mind is irrelevant if the challenged statements are identified as forward-looking and accompanied by meaningful cautionary language.  In re Cutera Sec. Litig., 610 F.3d 1103, 1113 (9th Cir. 2010).

To be meaningful, cautionary language "ought to be precise and relate directly to the forward-looking statements at issue."  In re Copper Mt. Secs. Litig., 311 F. Supp. 2d 857, 882 (N.D. Cal. 2004). However, "the PSLRA does not require a listing of all factors that might make the results different from those forecasted."  Id. (emphasis in the original).  Nor does "the law . . . require specification of the particular factor that ultimately renders the forward-looking statement incorrect."[3]  In re Nuvelo, Inc. Secs. Litig., No. C 07-4056 VRW, 2008 WL 5114325, at *16 (N.D. Cal. Dec. 4, 2008).  Adequate cautionary language is provided "when an investor has been warned of risks of a significance similar to that actually realized."  Harris v. Ivax Corp., 182 F.3d 799, 807 (11th Cir. 1999).

Plaintiffs do not dispute that the July 28 revenue forecasts for 3Q10 and FY10 were forward-looking statements.  Opp'n at 23. However, they contend that the forecasts do not qualify for the PSLRA safe harbor because they were not accompanied by meaningful cautionary language.  Id.  This argument lacks merit.  Among the risk factors identified by the July 28 press release were

---

[3] Indeed, the report that accompanied the PSLRA specified that "failure to include the particular factor that ultimately causes the forward-looking statement not to come true will not mean that the statement is not protected by the safe harbor."  H.R. Conf. Rep. 104-369, at 44 (1995), reprinted at 1995 U.S.C.C.A.N. 730, 743.

10

"unanticipated costs or difficulties relating to the integration of companies we have acquired"; "competition from existing and new competitors"; and "the loss or decline in business from our key customers." RJN Ex. 3.[4] The press release also directed investors to further discussions of risk factors contained in its recent quarterly and annual reports filed with the SEC. Id. Likewise, at the outset of the July 28 investors conference call, listeners were told that Equinix would be making forward-looking statements, and were advised that risks could cause actual results to differ from projections. FAC Ex. C at 2. Again, the company referred listeners to recent SEC filings for a fuller list of potential risks and uncertainties. Id. The cited 10-Q contains a sixteen-page "Risk Factor" section, which discusses, among other things: the risk of increased churn; the possibility of increased pricing pressure from competitors; the risk that Equinix would be unable to

---

[4] In support of their motion to dismiss Defendants filed a Request for Judicial Notice ("RJN"), attaching seventeen exhibits. ECF No. 31 ("RJN"). Federal Rule of Evidence 201 permits a court to take judicial notice of a fact "not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." When ruling on a 12(b)(6) motion to dismiss a § 10(b) action, courts must consider the complaint in its entirety, including "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, 551 U.S. at 322. Where a plaintiff fails to attach to the complaint the documents upon which the complaint is premised, a defendant may attach such documents in order to show that they do not support the plaintiff's claim. In re Pac. Gateway Exch., Inc., 169 F. Supp. 2d 1160, 1164 (N.D. Cal. 2001). Additionally, a court may take judicial notice of public filings, such as those made with the SEC. Dreiling v. Am. Exp. Co., 458 F.3d 942, 946 n. 2 (9th Cir. 2006). For the purposes of this Order, the Court takes judicial notice of Exhibits 2, 3, 15, and 16 to the RJN.

"integrate acquired businesses"; and dependence on key "magnet customers." RJN Ex. 2 at 43-59.

Plaintiffs contend that the cautionary language in Equinix's press release and SEC filings is insufficient since it "does not warn or allude to the possibility that the Company would simply ignore and fail to account for known customer discounts and settlements that would severely and negatively impact the revenue forecasts." Opp'n at 23. The Court disagrees. First, Equinix need not have warned of the exact risk that caused the company to miss its forecast. Nuvelo, 2008 WL 5114325, at *16. Second, the cautionary language in Equinix's SEC filings did warn of the possibility of pricing pressure and the dependence on magnet customers, factors which purportedly caused Equinix to offer discounts and settlements to its customers. The SEC filings also directly identified other risks that purportedly contributed to the revision of the revenue forecasts, including understatement of churn and lower than expected revenues from Switch and Data. Thus, taken together, Equinix's cautionary language "warned of risks of a significance similar to those actually realized." Ivax, 182 F.3d at 807. Third, contrary to Plaintiffs' suggestion, it does not appear that Equinix's failure to account for customer discounts "severely" impacted its revenue forecasts, since Equinix's July 28 forecasts were only off by a few percentage points.

Even if the July 28 forecasts were not accompanied by meaningful cautionary language, Plaintiffs do not plead that Defendants had actual knowledge that their forecasts could not be achieved at the time they were made. See Cutera, 610 F.3d at 1113. Plaintiffs argue that Smith must have known that Equinix could not

meet its July 28 forecasts because he admitted that he approved and was aware of the discounts offered to certain strategic customers during 2Q10 and 3Q10. Opp'n at 18 (citing FAC ¶¶ 36, 70-71, 73). The argument is unavailing. While Smith may have been aware of Equinix's customer discounts as early as 2Q10, there is no indication that he knew that the July 28 forecasts failed to account for these discounts. Indeed, on October 5, Smith stated that he only learned of the defects in the forecasting model "partway through" the third quarter. FAC ¶ 71. The plausibility of Smith's statement is strengthened by the fact that the July 28 forecasts were only a few percentage points off.

Plaintiffs further argue that Smith and Taylor must have known that there was something wrong with the forecasts since Taylor stated that management had "exceptional visibility" into Equinix's financial model. Opp'n at 19. Specifically, Taylor had boasted on July 28: "This is our thirtieth consecutive quarter of revenue and adjusted EBITDA growth and strong proof point of the exceptional visibility we have into this - our financial model and the track record of strong execution." FAC ¶ 49. The Court finds that Taylor's statement is too vague to be actionable or support an inference that Defendants had "actual knowledge" that Equinix could not achieve its revenue forecasts.

Accordingly, the Court finds that the July 28 forecasts fall under the PSLRA safe harbor because they were identified as forward-looking statements and accompanied by meaningful cautionary language. Plaintiffs' allegations regarding the July 28 forecasts also fail for the independent reason that Plaintiffs have not

13

adequately pled that Defendants had actual knowledge that the forecasts were incorrect at the time they were made.

### 2. Equinix's Pricing Strategy

Plaintiffs allege that Defendants misled investors about Equinix's pricing strategy. Specifically, Plaintiffs point to Defendants' July 28 and September 15 statements that Equinix's pricing was "firm" and "stable," e.g., "we're maintaining the discipline on the floors and ceilings we have on our pricing and the sales force is staying very, very disciplined on price," FAC ¶ 51; "pricing is holding firm," id. ¶ 54; "we're not going to trade price for volume," id. ¶ 65; "pricing is stable, it's firm," id. ¶ 66. Plaintiffs allege that these statements were false, pointing to Smith's October 5 statement that "during the second and third quarters, there were certain discounts and credit memos issued to a number of strategic customers." Id. ¶ 70.

Plaintiffs' allegations fail because Defendants maintained a consistent position on pricing throughout the class period. During the July 28 conference call, Smith conceded: "there are certain markets where certain pressure - pricing pressure [sic] and pricing behaviors are going to change." Id. ¶ 51. Smith also stated: "[I]f it's a strategic customer[,] we might get a little more aggressive [on pricing]." Id. ¶ 52. Consistent with these statements, Equinix offered price discounts to a few strategic customers during the second and third quarters of 2010. Id. ¶ 70.

Defendants argue Smith and Taylor's earlier statements concerning price are too "vague, generalized, and unspecific" to be actionable. MTD at 21. That may be overstating things. Had Equinix offered steep discounts to all of its customers while

14

Defendants represented that prices were "firm" and "stable," Plaintiffs might have a claim. But that is not the case here. Equinix allegedly offered discounts to only a few key customers -- a strategy disclosed to investors at the beginning of the class period -- and there is no indication that pricing varied for the rest of Equinix's customer base.

For these reasons, the Court finds that Plaintiffs have failed to adequately plead the falsity of Defendants' statements concerning Equinix's pricing strategy.

### 3. Switch and Data Integration

Likewise, Plaintiffs fail to adequately plead the falsity of Defendants' statements concerning the integration of Switch and Data. Equinix acquired Switch and Data on April 30, 2010, about three months prior to the class period. FAC ¶ 8. During the July 28 conference call Smith said of the merger: "the sales organizations have been completely integrated" and the integrated sales organization "in North America has been in place for weeks now." FAC ¶ 50. Plaintiffs argue that these statements were shown to be false by admissions made by Smith on October 5. Opp'n at 15. Contrary to Plaintiffs' argument, the October 5 statements do not constitute an admission that the Switch and Data sales force was not completely integrated or that the integrated sales force was not in place as of July 28. Read as a whole, the October 5 statement merely indicates that revenue from Switch and Data assets was lower than expected and that Equinix "ha[d] work to do" to improve the performance of these assets. Id. ¶ 70.

///
///

15

4. Defendants' Ability to Provide Accurate Forecasts

Plaintiffs also target Taylor's September 15 statement that Defendants "ha[d] a high degree of confidence in [their] ability" to offer guidance. Id. ¶ 65. Plaintiffs allege that the statement was materially false, as evidenced by the fact that Smith admitted that Defendant knew "partway through" the third quarter that the July 28 forecasts were false. Id. ¶ 71. The Court finds that Taylor's September 15 statement cannot support a claim for securities fraud since it constitutes a non-actionable expression of corporate optimism. See Cutera, 610 F.3d at 1111 ("A mildly optimistic, subjective assessment hardly amounts to a securities violation."). Further, Plaintiffs fail to show that the September 15 statement was false. Since the July 28 forecasts were only a few percentage points off, Defendants may have truthfully maintained a high degree of confidence in their ability to offer guidance.

5. Duty to Update

Though it is not clearly set forth in the FAC, Plaintiffs also argue that Defendants had a duty to correct their July 28 forecasts and that they violated this duty by waiting until October 5 to offer new, corrected guidance. Opp'n at 16; FAC ¶ 32. Plaintiffs once again point to Smith's statement that Defendants learned of problems with the July 28 guidance "partway through" the quarter and waited to correct this problem until they had reviewed "the September flash." Opp'n at 16 (citing FAC ¶¶ 70-71). This argument fails for a number of reasons.

First, the PSLRA does not impose a duty to update forward-looking statements. 15 USCS § 78u-5(d). Plaintiffs cite two cases

16

from this district referring to a duty to update or correct, In re LDK Solar Sec. Litig., No. C 07-05182 WHA, 2008 WL 4369987, at *10 (N.D. Cal. Sep. 24, 2008); Coble v. Broadvision Inc., No. C 01-01969 CRB, 2002 WL 31093589, at *7 (N.D. Cal Sep. 11, 2002). Opp'n at 16. However, neither case specifically addresses the duty to update in the context of forward-looking statements.

Second, even if a duty to update forward-looking statements exists, it would be unreasonable to apply it in circumstances such as this, where a forecast varies by only one or two percentage points. To hold otherwise would place companies in the untenable position of having to constantly update the public about de minimis changes in forecasts -- changes which are to be expected as more current data becomes available.

Third, Defendants did provide investors with an updated forecast on October 5. Plaintiffs argue that this update was unreasonably delayed, but this conclusion does not follow from the facts pled. Smith stated that the company waited to review "the September flash" before notifying the public so as to ensure the new forecast would be accurate. In light of the circumstances, that appears to be a reasonable precaution. After all, Defendants were dealing with inherently uncertain predictions and variances of only a few percentage points.

### 6. Stock Sales

Plaintiffs' allegations of fraud are further undercut by the fact that the FAC does not explain why Defendants would knowingly overstate their forecasts by a few percentage points, only to reveal the truth just ten weeks later. Plaintiffs do not allege that Smith, Taylor, or anyone else engaged in improper stock sales

17

or otherwise benefited from the alleged scheme to inflate Equinix's stock price. As Defendants point out, Taylor did not sell a single Equinix share during the class period and Smith only sold 5,275 shares pursuant to a pre-established Rule 10b5-1 plan. MTD at 23; RJN Exs. 15, 16.[5] By contrast, Smith disposed of about 34,000 shares in the six months preceding the class period and 53,000 shares in the succeeding six months. RJN Ex. 16. Likewise, Taylor sold 13,000 shares in the six months prior to the class period, and roughly 15,000 shares in the six months after the class period. RJN Ex. 15. In other words, Smith and Taylor held on to Equinix stock when its price was allegedly inflated and sold when it was not.

While "the absence of a motive allegation is not fatal," Tellabs, 551 U.S. at 325, it may significantly undermine a plaintiff's theory of fraud. In the instant action, Plaintiffs have not only failed to allege a motive but also an actionable statement. Ultimately, Plaintiffs' theory of fraud is predicated on a considerable drop in the price of Equinix stock, presumably caused by Equinix's failure to meet its July 28 forecasts. Plaintiffs' Section 10(b) allegations amount to little more than

---

[5] Plaintiffs object to RJN Exhibits 15 and 16, SEC Form 4's describing Smith and Taylor's stock sales, on the grounds that they are not referred to or relied upon by the FAC. ECF No. 33 ("RJN Opp'n"). Plaintiffs' objections are OVERRULED. A court may consider materials, even if they are not referenced in the pleading, so long as they meet the requirements for judicial notice set forth in Federal Rule of Evidence 201. Rosenbaum Cap. LLC v. McNulty, 549 F. Supp. 2d 1185, 1189 (N.D. Cal. 2008). Plaintiffs do not dispute that Smith and Taylor's Form 4's are "not subject to reasonable dispute" and "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Ev. 201. Accordingly, the Court takes judicial notice of them.

18

fraud by hindsight. Accordingly, Plaintiffs' Section 10(b) claim is DISMISSED.

### B. Plaintiffs' Section 20(a) Claim

Absent an underlying violation of the Exchange Act, there can be no control person liability under Section 20(a). Paracor Fin., Inc. v. Gen. Elec. Capital Corp., 96 F.3d 1151, 1161 (9th Cir. 1996). Because Plaintiffs have not pled a violation of Section 10(b), their control person claim is also DISMISSED. See Shurkin v. Golden State Vinters, Inc., 471 F. Supp. 2d 998, 1027 (N.D. Cal. 2006), aff'd 303 Fed. Appx. 431 (9th Cir. 2008).

## V. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants Equinix, Inc., Stephen M. Smith, and Keith Taylor's Motion to Dismiss. Plaintiffs Cement Masons & Plasterers Joint Pension Trust and the International Brotherhood of Electrical Workers Local 697 Pension Fund's First Amended Complaint is DISMISSED WITH LEAVE TO AMEND. Plaintiffs may file an amended complaint within thirty (30) days of this Order. Failure to do so will result in dismissal of this action with prejudice.

IT IS SO ORDERED.

Dated: March 2, 2012

_____
UNITED STATES DISTRICT JUDGE