**United States District Court**
For the Northern District of California

1

2

3

4

5                    IN THE UNITED STATES DISTRICT COURT

6             FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8   CEMENT MASONS & PLASTERERS          )  Case No. 11-01016 SC
    JOINT PENSION TRUST,                )
9   individually and on behalf of       )  ORDER GRANTING MOTION TO
10  all others similarly situated,      )  DISMISS
                                        )
11              Plaintiffs,             )
                                        )
12         v.                           )
                                        )
13  EQUINIX, INC., STEPHEN M.           )
    SMITH, and KEITH TAYLOR,            )
14                                      )
              Defendants.               )
15                                      )
                                        )
16  _____   )

17  I.   **INTRODUCTION**

18        Plaintiffs Cement Masons & Plasterers Joint Pension Trust

19  ("Cement Masons") and the International Brotherhood of Electrical

20  Workers Local 697 Pension Fund ("IBEW") (collectively,

21  "Plaintiffs") bring this putative securities class action against

22  Equinix, Inc. ("Equinix"), and Equinix's CEO, Stephen M. Smith

23  ("Smith"), and CFO, Keith D. Taylor ("Taylor") (collectively,

24  "Defendants").  Plaintiffs assert that the price of Equinix stock

25  was artificially inflated between July 29, 2010 and October 5, 2010

26  ("the Class Period") due to allegedly false and misleading

27  statements made by Defendants, and that Equinix's stock price

28

**United States District Court**
For the Northern District of California

1  plummeted over 33 percent when the falsity of these statements was

2  revealed.

3      Plaintiffs' First Amended Complaint ("FAC") focused on

4  Defendants' statements concerning financial forecasts, Equinix's

5  pricing strategy, and the integration of the sales force of Switch

6  and Data, an Equinix competitor acquired by the company earlier in

7  2010.  On March 2, 2012, the Court dismissed the FAC with leave to

8  amend, finding, among other things, that Defendants' financial

9  forecasts were non-actionable forward-looking statements.  ECF No.

10  40 ("Mar. 2 Order").[1]  Plaintiffs then filed a Second Amended

11  Complaint ("SAC"), the operative complaint in this action, on May

12  2, 2012.  ECF No. 44 ("SAC").  Unlike the FAC, the SAC does not

13  target Defendants' financial forecasts.  However, it does include

14  new allegations concerning Equinix's pricing strategy and the

15  integration of the Switch and Data sales force.  The SAC also

16  includes new factual allegations from confidential witnesses

17  ("CWs") who allegedly have inside information concerning Equinix's

18  operations during the class period.

19      Now before the Court is Defendants' Motion to Dismiss the SAC.

20  ECF No. 47 ("MTD").  The Motion is fully briefed.  ECF Nos. 50

21  ("Opp'n"), 52 ("Reply").[2]  Pursuant to Civil Local Rule 7-1(b), the

22  Court finds the motion suitable for determination without oral

23  argument.  For the reasons set forth below, the Motion is GRANTED.

24  ///

25  _____

[1] Cement Masons & Plasterers Joint Pension Trust v. Equinix Inc.,
26  2012 WL 685344, 2012 U.S. Dist. LEXIS 28094 (N.D. Cal. Mar. 2,
2012).

27
[2] At the Court's request, the parties also submitted supplemental
28  briefing on the issue of loss causation.  ECF Nos. 57 ("Defs.'
Supp. Br."), 58 ("Pls.' Supp. Br.").

**II.   BACKGROUND**

   **A.   Factual Background**

      The following facts are primarily taken from Plaintiffs' SAC, the operative pleading in this action.  Equinix is a public corporation that provides carrier-neutral data centers and internet exchanges.  SAC ¶ 2.  The Company connects businesses with partners and customers around the world through a global platform of high-performance data centers called International Business Exchanges ("IBXs").  Id.  IBX data centers enable customers to safeguard their infrastructure, house their assets and applications closer to users, and collaborate with partners and customers.  Id.  Equinix generates substantially all of its revenue through three offerings available to customers at its ninety-two IBX data centers: collocation services, interconnection services, managed IT services.  Id. ¶ 4.  These services provide customers with shared, equipped facilities for their computer and data systems.  See id. ¶¶ 5-7.

      Equinix acquired Switch and Data, one of its competitors, in April 2010.  Id. ¶ 10.  In a May 7, 2010 conference call with investors, Smith said of the acquisition: "Our overriding goal [is] to drive an aggressive integration schedule to move towards a one company model, with full annualized synergies to be realized no later than mid-2011."  Id. ¶ 75.  On July 28, 2010, the day before the commencement of the class period, Equinix issued a press release announcing its 2Q10 financial results.  Id. ¶ 101.  The release stated: "The integration of Switch and Data is ahead of schedule, and our expansions are providing us much needed capacity

1   in many of our key markets, which positions us well for future

2   growth." <u>Id.</u>

3      Also on July 28, 2010, Equinix held a conference call with

4   investors. <u>Id.</u> ¶ 102. During that conference call, Smith and

5   Taylor further commented on the Switch and Data integration:

6

7         [Smith:] Overall[,] the integration is proceeding very
well . . . . We are on track to achieve the $20 million
cost synergies previously outlined and have moved

8         aggressively towards this goal . . . . Shifting gears
to revenue synergies, we've established a strong

9         foundation driving revenue across the integrated
platform. . . . <u>The sales organizations have been</u>

10       <u>completely integrated with full cost synergies already</u>
<u>achieved in the sales function.</u> So we now have sales

11       teams focused on revenue synergies by driving bookings
and grow key accounts.

12

13         [Taylor:] We've got the sales forces cross selling into
both assets. They're all part of one team today, the

14       organization is completely finished in sales, so the
structure all the way up to the sales leader in North

15       America has been in place for weeks now. <u>Id.</u>

16   <u>Id.</u> (emphasis added).

17      Plaintiffs also point to allegedly false and misleading

18   statements concerning the Switch and Data integration made on

19   September 1 and 15, 2010. The September 1 statement comes from an

20   RBC Capital report: "We recently met with Equinix CFO Keith

21   Taylor. Our discussion touched on the following topics: M&A: The

22   Company appears to have the Switch & Data integration process in

23   hand and ahead of schedule." <u>Id.</u> ¶ 135. On September 15, Taylor

24   made a presentation at an investors' conference, stating: "[T]he

25   pipeline's as healthy as it's ever been. Our close rates are good.

26   . . . And we're cross-selling within the Switch and Data asset and

27   the Equinix asset." <u>Id.</u> ¶ 141.

28

**United States District Court**
For the Northern District of California

1    Plaintiffs allege that these statements regarding the

2   integration of Switch and Data's sales force were false and

3   misleading.  In support, they point to statements made by Smith on

4   a conference call with investors on October 5, 2010, the last day

5   of the class period:

6

7          [R]evenues from our Swtich and Data assets were lower
           than expected through the third quarter. . . .  We are
8          five months into our integration plan, and we've been
           able to achieve cost synergy targets, resulting in a 7-
9          point improvement to the Switch and Data adjusted
           EBITDA[3] margins.  We're also starting to see the
10         pipeline for these locations strengthen and convert into
           bookings, with several notable wins in the third quarter.
11         We still have work to do to realign the combined sales
           organizations, but our expectations are that we will see
12         improvement in the utilization of the former Switch and
           Data assets as we exit 2010.

13  Id. ¶ 148.

14   Next, Plaintiffs point to a number of statements from their

15  CWs, all former Equinix employees who had worked for Switch and

16  Data before it was acquired.  CW3, a former Equinix senior

17  marketing manager, states that Equinix shifted accounts away from

18  former Switch and Data representatives and gave them to Equinix

19  representatives, without consideration of which sales

20  representative was most likely to win the deal.  Id. ¶ 129.  CW3

21  also states that, in response to this strategy, former Switch and

22  Data representatives concealed their pipelines of potential deals

23  from Equinix management.  Id. ¶ 130.  CW2, a former Equinix sales

24  representative, and CW4, a former Equinix product manager, echoed

25  CW3, stating that accounts were given to longstanding Equinix sales

26

27  ³ Adjusted EBITDA is defined as income or loss from operations plus
    depreciation, amortization, accretion, stock-based compensation
28  expense, restructuring charges, acquisition costs, and gains on
    asset sales.

1   representatives, even though former Switch and Data sales

2   representatives were far more knowledgeable about how to sell space

3   in former Switch and Data sales centers.  Id. ¶ 130.  According to

4   CW1, Equinix's former director of channel marketing, former Switch

5   and Data sales representatives told her that their efforts to

6   assist longstanding Equinix sales representatives were rejected.

7   Id. ¶ 133.  CW1 also alleges that she entered these remarks in

8   weekly cross-selling reports -- reports which allegedly reflected

9   that Equinix missed sales opportunities that would have resulted in

10  millions of dollars of additional revenues.  Id.

11       Plaintiffs also allege that Defendants made false and

12  misleading statements concerning the stability of their pricing.

13  Specifically, Plaintiffs allege that Defendants falsely stated that

14  Equinix's pricing remained firm and misled investors who expressed

15  concern that a more competitive landscape would force Equinix to

16  offer more discounts.  Id. ¶¶ 103, 106.  Plaintiffs primarily focus

17  on statements made during the July 28 conference call.  During that

18  call, Taylor stated: "Overall North America pricing remains firm

19  across both the organic and the Switch and Data footprint."  Id. ¶

20  102.  Also on that call, Smith stated:

21          And so in certain markets we're going to get some pricing
            pressure on certain deals.  If it's a strategic deal and
22          it's a magnet deal for us, we'll get more aggressive.  If
            it's not, we're going to let it go and whether it goes to
23          a competitive retail or a wholesale business, so be it.
            We're maintaining the discipline on the floors and
24          ceilings we have on our pricing and the sales force is
            staying very, very disciplined on price.
25

26
    Id. ¶ 105.  Smith later added: "So, yes there's pricing pressure
27
    there and yes we lots of times walk with it if it's a strategic
28

**United States District Court**
For the Northern District of California

1  customer we might get a little more aggressive.  Are we thinking

2  about figuring out how to get into that space today, no, we don't

3  really need to." <u>Id.</u> ¶ 106.

4      Again, Plaintiffs also point to statements made by Defendants

5  on September 1 and 15, 2010.  The September 1 RBC Capital report

6  states: "Overall, we believe pricing remains largely stable across

7  most markets/datacenters, and note that list pricing in some

8  product areas has increased this year . . . .  Meanwhile, wholesale

9  operators' increasing presence in smaller deals does not appear to

10 be affecting Equinix'[s] overall pricing . . . ." <u>Id.</u> ¶ 135.  On

11 September 15, Taylor stated: "Look, we can win on price if we want

12 to win on price.  I think you've heard us say periodically we're

13 not going to trade price for volume." <u>Id.</u> ¶ 141.  Plaintiffs also

14 point to Taylor's statements at a conference on September 22, 2010:

15 "[T]his is sort of a consistent message you've heard from us

16 previously, that pricing is stable, it's firm." <u>Id.</u> ¶ 142.

17     Plaintiffs allege that later statements made by Defendants in

18 October 2010 show that pricing was not stable during the class

19 period.  Specifically, Plaintiffs point to statements made by Smith

20 in a conference call with investors on October 5, 2010:

21

22     During the second and third quarters, there were certain
       discounts and credit memos issued to a number of
       strategic customers in exchange for longer-term
23     contracts.  As we've discussed in the past, we have been
       incenting our salesforce to extend the contract terms of
24     magnet customers, though this can result in a price
       concession for some.

25

26 <u>Id.</u> ¶ 148.  Smith made similar statements in response to analysts'

27 questions on the call: "We historically have said we will not trade

28 volume for price.  But these are strategic magnets.  There are

7

1   magnets that will go after, and we will adjust.  In this case, it's

2   just over 10 percent is the effect of the adjustment on their

3   existing pricing."  Id. ¶ 153.

4        Plaintiffs allege that the account of CW5, a former Equinix

5   regional director, also shows that Equinix's class-period

6   statements concerning pricing stability were false and misleading.

7   According to CW5, prior to and during the Class Period, Equinix

8   sales representatives were empowered to offer customers discounts

9   of up to 10 percent without any supervisory approval.  Id. ¶ 125.

10  CW5 also reports that she was responsible for reviewing and

11  "regularly approved" discounts of between 10 and 30 percent.  Id. ¶

12  124.  Further, CW5 reports that "it was not uncommon" for discounts

13  to rise above 30 percent with the approval of Equinix's finance

14  director.  Id. ¶ 125.  Finally, CW5 reports that Equinix discounted

15  installation charges prior to and during the class period.  Id. ¶

16  126.  Plaintiffs do not allege the size or frequency of these

17  discounts.

18       On October 5, 2010, Equinix also stated that it would miss its

19  July 28, 2010 revenue projections for 3Q10 and FY10 by 1.2 to 2.2

20  percent.  Mar. 2 Order at 4.  Investors reacted negatively to the

21  October 5 announcements.  Id. at 5.  Equinix's stock price fell

22  from $106.09 on October 5 to $70.34 the next day, a one-day loss of

23  over 33 percent of shareholder equity.  Id.

24       **B.**   **Procedural History**

25       Cement Masons, which had purchased Equinix stock during the

26  Class Period, filed the instant action in federal court on March 4,

27  2011.  ECF No. 1 ("Compl.").  IBEW, another Equinix stockholder

28  that is represented by the same counsel as Cement Masons, was

**United States District Court**
For the Northern District of California

1   appointed as lead plaintiff on August 8, 2011.  ECF No. 23 ("Aug.

2   8, 2011 Order").  The FAC was filed about six weeks later,

3   asserting causes of action for (1) violations of Section 10(b) of

4   the Securities Exchange Act of 1934 ("the Exchange Act") and of

5   United States Securities and Exchange Commission ("SEC") Rule 10b-

6   5; and (2) violations of Section 20(a) of the Exchange Act.  Mar. 2

7   Order at 6.  The crux of the FAC was that Defendants made a number

8   of false and misleading statements concerning: (1) Equinix's

9   financial forecasts for 3Q10 and FY10; (2) Equinix's pricing

10  strategy; (3) the integration of Switch and Data's sales force; and

11  (4) Equinix's ability to provide accurate financial forecasts.  Id.

12  The FAC did not include any of the CW allegations set forth above.

13       On March 4, 2012, the Court granted Defendants' motion to

14  dismiss the FAC, but granted Plaintiffs leave to amend their

15  complaint.  Id. at 19.  The Court found that Equinix's financial

16  forecasts were not actionable because they fell under the safe

17  harbor for forward looking statements set out in the Private

18  Securities Litigation Reform Act ("PSLRA").  Id. at 13.  The Court

19  also found that Plaintiffs failed to adequately plead the falsity

20  of Defendants' statements concerning Equinix's pricing strategy and

21  the integration of the Switch and Data sales force.  Id. at 15.

22  Specifically, the Court held that "Defendants maintained a

23  consistent position on pricing throughout the class period" and

24  that Defendants' "October 5 statements do not constitute an

25  admission that the Switch and Data sales force was not completely

26  integrated or that the integrated sales force was not in place as

27  of July 28."  Id.

28

**United States District Court**
For the Northern District of California

Plaintiffs filed their SAC on May 2, 2012. Like the FAC, the SAC asserts causes of action for violations of Sections 10(b) and 20(a) of the Exchange act and SEC Rule 10b-5 and alleges that Defendants made false and misleading statements concerning the integration of Switch and Data and Equinix's pricing strategy. However, Plaintiffs no longer allege that the July 28, 2010 financial forecasts for 3Q10 and FY10 were actionably false. SAC ¶ 10 n.2. On June 15, 2012, Defendants moved to dismiss the SAC.

## III. LEGAL STANDARD

### A.   Motion to Dismiss

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001). "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). The court's review is generally "limited to the complaint, materials incorporated into the complaint by reference, and matters of which the court may take

**United States District Court**
For the Northern District of California

1  judicial notice."  <u>Metzler Inv. GMBH v. Corinthian Colls., Inc.</u>,

2  540 F.3d 1049, 1061 (9th Cir. 2008) (citing <u>Tellabs, Inc. v. Makor</u>

3  <u>Issues & Rights, Ltd.</u>, 551 U.S. 308, 322 (2007)).

4      **B.   Section 10(b)**

5      Section 10(b) of the Exchange Act makes it unlawful "[t]o use

6  or employ, in connection with the purchase or sale of any security

7  registered on a national securities exchange . . . any manipulative

8  or deceptive device or contrivance in contravention of such rules

9  and regulations as the [SEC] may prescribe . . . ."  15 U.S.C. §

10  78j(b).  One such rule prescribed by the SEC is Rule 10b-5, which

11  states that "[i]t shall be unlawful for any person . . . [t]o

12  engage in any act, practice, or course of business which operates

13  or would operate as a fraud or deceit upon any person, in

14  connection with the purchase or sale of any security."  17 C.F.R. §

15  240.10b-5(c).  Plaintiffs must plead five elements to establish a

16  violation of Rule 10b-5.  Specifically, Plaintiffs must demonstrate

17  "(1) a material misrepresentation or omission of fact, (2)

18  scienter, (3) a connection with the purchase or sale of a security,

19  (4) transaction and loss causation, and (5) economic loss."  <u>In re</u>

20  <u>Daou Sys.</u>, 411 F.3d 1006, 1014 (9th Cir. 2005).

21      Plaintiffs must also meet the heightened pleading standards of

22  Federal Rule of Civil Procedure 9(b) and the PSLRA, 15 U.S.C. §

23  78u-4.  The PSLRA requires plaintiffs to "specify each statement

24  alleged to have been misleading [and] the reason or reasons why the

25  statement is misleading."  15 U.S.C. § 78u-4(b)(1).  Additionally,

26  the complaint must "state with particularity facts giving rise to a

27  strong inference that the defendant acted with the required state

28  of mind."  <u>Id.</u> § 78u-4(b)(2).  The "required state of mind" for

**United States District Court**
For the Northern District of California

1   establishing securities fraud is the knowing, intentional, or

2   deliberately reckless disclosure of false or misleading statements.

3   See Daou, 411 F.3d at 1014-15.  "The stricter standard for pleading

4   scienter naturally results in a stricter standard for pleading

5   falsity, because falsity and scienter in private securities fraud

6   cases are generally strongly inferred from the same set of facts,

7   and the two requirements may be combined into a unitary inquiry

8   under the PSLRA."  Id. at 1015 (internal quotation marks omitted).

9

10  **IV.   DISCUSSION**

11       **A.   Plaintiffs' Section 10(b) Claim**

12            1.   PSLRA Safe Harbor

13       Defendants first argue that the challenged July 28 statements

14  concerning the Switch and Data integration and Equinix's pricing

15  are insulated by the PLSRA safe harbor.  MTD at 11.  The PSLRA

16  provides a safe harbor for "forward-looking statements," 15 U.S.C.

17  § 78u-5(c), which includes "a statement containing a projection of

18  revenues, income (including income loss), [and] earnings (including

19  earnings loss) per share," id. § 78u-5(i)(1)(A), as well as "any

20  statement of the assumptions underlying or relating to" such

21  financial projections, id. § 78u-5(i)(1)(D).  Defendants reason

22  that the challenged July 28 statements constitute assumptions

23  underlying or relating financial projections since they were made

24  in connection with Equinix's revenue and profitability forecasts.

25  MTD at 11.  Plaintiffs respond that descriptions of the present are

26  not forward looking and are therefore ineligible for the safe

27  harbor.  Opp'n at 24 (citing Berson v. Applied Signal Tech., Inc.,

28  527 F.3d 982, 990 (9th Cir. 2008)).

United States District Court
For the Northern District of California

1    The Court agrees with Plaintiffs.  The challenged July 28
2  statements are not forward looking; they are descriptions of the
3  present.  See, e.g., SAC ¶¶ 102 ("The sales organizations have been
4  completely integrated . . . ."), 105 ("We're maintaining the
5  discipline on the floors and ceilings we have on our pricing . . .
6  ."). These statements do not fall under the safe harbor merely
7  because they were made on the same call that Equinix released its
8  financial projections for 3Q10 and FY10. To the extent that these
9  statements could be construed as assumptions underlying or relating
10 to Equinix's financial projections, they are not only that. For
11 example, when Defendants told investors that they were not trading
12 price for volume, they were saying both that they were currently
13 maintaining discipline on price and that they had reason to believe
14 their pricing strategy would yield certain revenues in the future.
15 See Makor Issues & Rights, Ltd. v. Tellabs Inc., 513 F.3d 702, 705
16 (7th Cir. 2008) ("The element of prediction in saying that sales
17 are 'still going strong' does not entitle [defendant] to a safe
18 harbor with regard to the statement's representation concerning
19 current sales.").

20    Accordingly, the Court rejects Defendants' argument that the
21 July 28 statements are not actionable under the PSLRA safe harbor.

22          2.   Statements Regarding Sales Force Integration
23    Defendants also argue that Plaintiffs have to failed to
24 adequately allege the falsity and scienter of the statements
25 regarding Equinix's sales force integration. MTD at 12-17. As
26 Defendants point out, the Ninth Circuit's decision in Ronconi v.
27 Larkin, 253 F.3d 423 (9th Cir. 2001), is instructive. In that
28 case, the plaintiffs targeted the defendants' statements that the

13

**United States District Court**
For the Northern District of California

consolidation of an acquired company's sales force had been
completed in January 1996.  Ronconi, 253 F.3d at 431.  The
plaintiffs contended that these statements were false because the
consolidation of the sales forces was plagued with problems,
resulting in inefficiencies and lack of revenue growth.  Id. at
432.  The plaintiffs pointed in particular to the following
statement by the defendants from April 1996: "revenue growth rates
. . . were significantly impacted by the termination of the
company's independent . . . distributor network at the end of the
second quarter, and the transition to a newly integrated sales
force."  Id. at 431.   The Ninth Circuit found that the plaintiffs
had failed to adequately allege falsity, reasoning: "The [April
1996] statement arguably implies that the consolidation of
marketing had not worked out as well and as rapidly as hoped.  The
statement does not support an inference that company insiders knew
or with deliberate recklessness disregarded that the problems would
be so substantial."  Id.

     Likewise, here, Plaintiffs have merely pled that Defendants
were initially optimistic about the integration of the Switch and
Data sales force, but later discovered that the integration did not
proceed as smoothly as they had hoped.  On the July 28 conference
call, Smith stated:  "The sales organizations have been completely
integrated with full cost synergies already achieved in the sales
function.  So we now have sales teams focused on revenue synergies
by driving bookings and grow key accounts."  SAC ¶ 102.  On October
5, Smith remained positive about the cost synergies from the sales
force integration:  "[W]e've been able to achieve cost synergy
targets, resulting in a 7-point improvement to the Switch and Data

**United States District Court**
For the Northern District of California

1   adjusted EBITDA margins.  SAC ¶ 148.  However, he was less

2   optimistic about revenue synergies: "[R]evenues from our Switch and

3   Data assets were lower than expected through the third quarter. . .

4   ."  Id.  The Court finds that the October 5 statements do not show

5   that the July 28 statements were false.  Rather, the October

6   statements merely show that Equinix was unable to achieve the

7   revenue synergies that Equinix sales teams had been focused on in

8   July.

9       Nor do the CW allegations establish the falsity of Defendants'

10  statements concerning the integration of Switch and Data.  Assuming

11  that the CW's accounts are reliable, they merely show that Equinix

12  favored their longstanding sales representatives over former Switch

13  and Data sales representatives and that this practice ultimately

14  hurt Equinix's integration and cross-selling efforts.  Nothing

15  about this is inconsistent with Defendants' representations that

16  the sales force was integrated, that all of the sales

17  representatives were part of one team, that Equinix had recognized

18  "cost synergies," that Defendants expected to achieve revenue

19  synergies in 3Q10 and beyond, or that the sales force was cross

20  selling Equinix and Switch and Data products.

21      To the extent that Plaintiffs are alleging that Defendants

22  knew or should have known that their integration efforts would

23  encounter the problems identified by the CWs, they have failed to

24  adequately plead scienter.  According to CW3, former Switch and

25  Data representatives "concealed their pipelines of potential deals

26  from Equinix management."  SAC ¶ 130.  Thus, Defendants could not

27  have immediately discovered the practice and Plaintiffs do not

28  plead when it came to light.

**United States District Court**
For the Northern District of California

1    CW1 states that she and her team issued weekly reports to

2   management that reflected that former Switch and Data's efforts to

3   assist long standing Equinix sales representatives were rejected

4   and that Equinix missed sales opportunities that would have

5   resulted in millions of dollars of additional revenues.  This is

6   also insufficient to raise a strong inference of scienter.  As an

7   initial matter, it is not clear that Defendants ever saw these

8   weekly reports.  Even if they did, Plaintiffs have not pled the

9   specific contents of the reports, how they allegedly characterized

10  the problem, or when they were released.  Further, CW1's statement

11  that Equinix missed millions of dollars of sales opportunities

12  lacks the necessary context.  Presumably, Equinix did not convert

13  every potential opportunity into a sale and it is not clear from

14  CW1's account whether Equinix missed more sales opportunities than

15  usual during the class period.

16    For these reasons, the Court finds that Plaintiffs have not

17  met the heightened pleading standards of the PSLRA with respect to

18  their sales force integration allegations.

19               3.   Statements Regarding Pricing

20    The Court also finds that Plaintiffs have failed to adequately

21  allege the falsity of Defendants' statements concerning pricing.

22  In dismissing Plaintiffs' FAC, the Court held that Plaintiffs'

23  allegations showed that "Defendants maintained a consistent

24  position on pricing throughout the class period."  Mar. 2 Order at

25  19.  The same is true with respect to Plaintiffs' SAC.  Once again,

26  Plaintiffs allege that, during the July 28 conference call, Smith

27  stated: "And so in certain markets we're going to get some pricing

28  pressure on certain deals.  If it's a strategic deal and it's a

magnet deal for us, we'll get more aggressive." SAC ¶ 105.
Defendants' later public statements are consistent with their
earlier position that they would "get more aggressive" on price for
magnet customers. On October 5, Smith stated that "[d]uring the
second and third quarters, there were certain discounts and credit
memos issued to a number of strategic customers in exchange for
longer-term contracts." Id. ¶ 148. Smith later indicated that
these discounts were "just over 10 percent." Id. ¶ 153.

Plaintiffs argue that securities analysts tied Equinix's stock
price decline directly to the magnitude of discounts provided to
customers. Pls.' Supp. Br. at 4-5. Specifically, they point to
the following analyst statements: "The downgrade can primarily be
credited to greater-than-expected customer losses in North America
and price discounting to secure long-term contract renewals," id. ¶
177; "[Equinix] needed to cut prices by more than expected," id. ¶
168; "the magnitude of the discounts on large deals surprised us,"
id. ¶ 174; "pricing pressures . . . spooked investors," id. ¶ 175.
However, these statements merely indicate that investors and
analysts expected one thing and got another. Defendants warned
that they may offer discounts to attract magnet customers, and it
appears that those discounts were larger and more widespread than
investors expected. Defendants cannot be held liable for thwarting
investor expectations.[4]

Plaintiffs also argue that CW5's account, which was not
included in the FAC, further details the reason why Defendants'

---

[4] Likewise, RBC Capital's expectations concerning Equinix's pricing
and integration efforts, as described at paragraph 135 of the SAC,
cannot be attributed to Defendants and, thus, do not support
Plaintiffs' allegations of fraud.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

earlier pricing statements were false.  Opp'n at 9.  CW5, a former
Equinix Regional Director, states that Equinix sales
representatives were authorized to offer 10 percent discounts
without approval, that she regularly approved discounts of 10 to 30
percent, and that it was not uncommon for discounts to rise above
30 percent with the approval of higher management.  SAC ¶¶ 124-25.
The SAC indicates that these discounts were never revealed to the
market.  See id. ¶ 19 n. 4. ("Plaintiffs now allege that Equinix
not only admitted providing discounts to 'a number of customers,'
but that the discounts actually provided were both wider and of far
wider magnitude than Equinix admitted on October 5, 2010.").

The Court finds that Plaintiffs have failed to adequately
allege loss causation with respect to CW5's statements.  To state a
claim under Section 10(b) of the Exchange Act, a plaintiff must
plead facts demonstrating loss causation, i.e., "a causal
connection between the material misrepresentation and the loss."
Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 342 (2005).  To
adequately plead loss causation, a plaintiff must allege, among
other things, a fraudulent statement that inflated the stock price
and a corrective disclosure that later revealed that the earlier
fraudulent statement was false and caused the stock price to drop.
See Metzler, 540 F.3d at 1062.  In this case, Plaintiffs have
failed to allege a corrective disclosure.  Specifically, there is
no indication that the widespread discounting described by CW5 was
ever disclosed to the market.  The only public disclosures alleged
by Plaintiffs occurred on October 5, and those disclosures merely
revealed that Equinix had offered 10 percent discounts to certain
"magnet customers."  See, e.g., ¶¶ 148, 153.  Because the

widespread discounting described by CW5 was never revealed to the market, it could not have caused Equinix's stock price to drop on October 6 or otherwise caused Plaintiffs' alleged loss.

Accordingly, the Court finds that Plaintiffs have failed to adequately allege falsity and loss causation with respect to Defendants' statements concerning pricing.  As Plaintiffs have also failed to adequately plead falsity and scienter with respect to Defendants' statements concerning the Switch and Data integration, Plaintiffs' Section 10(b) claims are DISMISSED.

**B.    Plaintiffs' Section 20(a) Claim**

Absent an underlying violation of the Exchange Act, there can be no control person liability under Section 20(a).  Paracor Fin., Inc. v. Gen. Elec. Capital Corp., 96 F.3d 1151, 1161 (9th Cir. 1996).  Because Plaintiffs have not pled a violation of Section 10(b), their control person claim is also DISMISSED.  See Shurkin v. Golden State Vinters, Inc., 471 F. Supp. 2d 998, 1027 (N.D. Cal. 2006), aff'd 303 Fed. Appx. 431 (9th Cir. 2008).

///

///

///

///

///

///

///

///

///

///

///

United States District Court
For the Northern District of California

**IV.  CONCLUSION**

For the foregoing reasons, the Court GRANTS Defendants Equinix, Inc., Stephen M. Smith, and Keith Taylor's Motion to Dismiss.  Plaintiffs Cement Masons & Plasterers Joint Pension Trust and the International Brotherhood of Electrical Workers Local 697 Pension Fund's Second Amended Complaint is DISMISSED WITH LEAVE TO AMEND.  Plaintiffs may file an amended complaint within thirty (30) days of this Order.  Failure to do so will result in dismissal of this action with prejudice.


IT IS SO ORDERED.


Dated: December 5, 2012

UNITED STATES DISTRICT JUDGE