United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CEMENT MASONS & PLASTERERS JOINT PENSION TRUST, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>EQUINIX, INC., STEPHEN M. SMITH, and KEITH TAYLOR,<br><br>Defendants. | Case No. 11-01016 SC<br><br>ORDER GRANTING MOTION TO DISMISS |

## I.   INTRODUCTION

Plaintiffs Cement Masons & Plasterers Joint Pension Trust ("Cement Masons") and the International Brotherhood of Electrical Workers Local 697 Pension Fund ("IBEW") (collectively, "Plaintiffs") bring this putative securities class action against Equinix, Inc. ("Equinix"), and Equinix's CEO, Stephen M. Smith ("Smith"), and CFO, Keith D. Taylor ("Taylor") (collectively, "Defendants").  Plaintiffs assert that the price of Equinix stock was artificially inflated between July 29, 2010 and October 5, 2010 (the "Class Period") due to allegedly false and misleading statements made by Defendants, and that Equinix's stock price

plummeted over 33 percent when the falsity of these statements was revealed.

Plaintiffs' previous attempts to state a claim against Defendants have been unsuccessful. The Court dismissed Plaintiffs' First Amended Complaint ("FAC") and Second Amended Complaint ("SAC") with leave to amend. ECF Nos. 40 ("FAC Order"), 63 ("SAC Order").[1] Plaintiffs recently filed a Third Amended Complaint, ECF No. 66 ("TAC"), which Defendants now move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), ECF No. 67 ("MTD"). The motion is fully briefed, ECF Nos. 70 ("Opp'n"), 74 ("Reply"), and appropriate for determination without oral argument pursuant to Civil Local Rule 7-1(b).

The Court finds that the TAC does not assert any new facts that could remedy the pleading deficiencies previously identified by the Court. Indeed, the facts and legal theories pled in the TAC are virtually identical to those set forth in the FAC and SAC and rejected in the Court's prior orders. Accordingly, Defendants' motion to dismiss is GRANTED and Plaintiffs' case is DISMISSED WITH PREJUDICE.

**II.   BACKGROUND**

    **A.   Factual Background**

Equinix is a public corporation that provides carrier-neutral data centers and internet exchanges. TAC ¶ 5. Equinix connects businesses with partners and customers around the world through a

---

[1] Cement Masons & Plasterers Joint Pension Trust v. Equinix Inc., 2012 WL 685344, 2012 U.S. Dist. LEXIS 28094 (N.D. Cal. Mar. 2, 2012); Cement Masons & Plasterers Joint Pension Trust v. Equinix, Inc., 11-01016 SC, 2012 WL 6044787, 2012 U.S. Dist. LEXIS 172711 (N.D. Cal. Dec. 5, 2012).

2

global platform of high-performance data centers called International Business Exchanges ("IBX(s)"). Id. IBXs enable customers to safeguard their infrastructure, house their assets and applications closer to users, and collaborate with partners and customers. Id. Equinix generates substantially all of its revenue through three offerings available to customers at its ninety-two IBXs: collocation services, interconnection services, and managed IT services. Id. ¶¶ 7-10. These services provide customers with shared, equipped facilities for their computer and data systems. See id.

Equinix acquired Switch and Data, one of its competitors, during the second quarter of 2010. Id. ¶ 13. Equinix's overall financial results for that quarter were positive. On July 28, 2010, the day before the commencement of the Class Period, the Company issued a press release announcing that it had posted its thirtieth consecutive quarter of sequential growth, reporting revenues of $296.1 million. Id. ¶¶ 102-03. In the same release, Equinix offered financial projections for the third quarter 2010 ("3Q10") and fiscal year 2010 ("FY10"). Equinix forecasted 3Q10 revenue of $335 to $338 million and FY10 revenue of $1.225 to $1.235 billion (the "July 28 guidance"). Id. ¶ 102. Adjusted EBITDA[2] for FY10 was expected to be between $535 and $540 million. TAC Ex. C.

The guidance was accompanied by cautionary language. The July 28 press release stated: "This press release contains forward-

---

[2] Adjusted EBITDA is defined as income or loss from operations plus depreciation, amortization, accretion, stock-based compensation expense, restructuring charges, acquisition costs, and gains on asset sales.

3

looking statements that involve risks and uncertainties.  Actual results may differ materially from expectations discussed in such forward-looking statements."  Id.  The risk factors identified in the release included "unanticipated costs or difficulties relating to the integration of companies we have acquired"; "competition from existing and new competitors"; and "the loss or decline in business from our key customers."  Id.  The press release also directed investors to further discussions of risk factors contained in its recent quarterly and annual reports filed with the SEC.  Id.  The cited 10-Q contains a sixteen-page "Risk Factor" section, which discusses, among other things: the risk of increased churn; the possibility of increased pricing pressure from competitors; and dependence on key "magnet customers."  FAC Order at 11-12.

Also on July 28, 2010, Defendants made a number of statements concerning Equinix's pricing strategy.  On a conference call, responding to investor questions about whether Equinix could maintain its firm pricing in the face of an increasingly competitive environment, Smith commented: "We're not going to go below a threshold," and "[w]e're maintaining the discipline on the floors and ceilings we have on our pricing and the sales force is staying very, very disciplined on price."  TAC ¶¶ 14, 66.

Smith conceded that there would be certain exceptions to this stable pricing strategy: "If it's a strategic deal and it's a magnetic deal for us, we'll get more aggressive."  Id. ¶ 106.  Smith also stated: "So, yes there's pricing pressure there and yes we lots of times walk away with it if it's a strategic customer we might get a little more aggressive."  Id. ¶ 107.  Taylor later reiterated Equinix's pricing strategy in a talk with investors on

4

September 15, 2010, stating: "[W]e're not going to trade price for volume," and "this is sort of a consistent message you've heard from us previously, that pricing is stable, it's firm." Id. ¶¶ 21, 135.

On October 5, 2010, the last day of the Class Period, Equinix announced in a press release that it now expected 3Q10 revenue of $328 to $330 million, a 2.2 percent reduction from the July 28 guidance, and FY10 revenue of $1.215 billion, a 1.2 percent reduction from the July 28 guidance. Id. ¶ 142. However, Equinix also increased its adjusted EBITDA outlook to $540 million for FY10. TAC Ex. G.

In a conference call with investors on the same day, Smith stated that the downward revision in revenue was due to understated churn (i.e., customer attrition) assumptions, lower than expected revenues related to the company's Switch and Data assets, and customer discounts that were not fully contemplated when Equinix offered the July 28 guidance. TAC ¶ 142. Smith explained:

> [W]e just had an assumption that was missed in the guidance. . . . So it was an error on our part. Should've seen it in Q2. We caught it part way through. We wanted to see the September flash so we'd make darn sure we knew what the heck we were looking at. And that's why we decided to get that behind us, looking at the September flash and getting it out to you guys today.

Id. ¶ 146. In responding to question about falling prices, Taylor stated:

> "[W]hen we went in and, if you will, provided those credits to the customers, we made some adjustments in debit and credit memos. And those weren't fully contemplated when we offered guidance. And so what we had is basically a June exit rate that didn't fully represent that adjustment . . . . [T]he impact of the

5

> credits and debits going through our systems and how people forecast those assumptions caused us . . . to provide a guidance range that didn't fully contemplate that credit or debit note."

Id.

Smith also addressed Equinix's pricing strategy, stating that Equinix had provided discounts to a number of strategic customers:

> During the second and third quarters, there were certain discounts and credit memos issued to a number of strategic customers in exchange for longer-term contracts.  As we've discussed in the past, we have been incenting our salesforce to extend the contract terms of magnet customers, though this can result in a price concession for some.

TAC Ex. H at 3.  Smith made similar statements in response to analysts' questions on the call: "We historically have said we will not trade volume for price.  But these are strategic magnets.  There are magnets that will go after, and we will adjust.  In this case, it's just over 10 percent is the effect of the adjustment on their existing pricing."  Id. at 12.

Plaintiffs claim that the discounts Equinix offered were even larger than those disclosed on October 5, pointing to allegations from a confidential witness ("CW") who was formerly the "Regional Director, Inside Sales East" at Switch and Data and Equinix.  TAC ¶ 46.  The CW states that "Equinix executives did not want to be brought potential deals unless they would definitely close, so discounts were widely offered with little oversight" and that the CW "regularly approved discounts between 10-30%."  Id. ¶ 128.  The CW also states that, "prior to and during the Class Period, Equinix sales reps themselves were empowered to offer a customer up to a 10% discount without any supervisory or managerial approval," and "it was not uncommon for discounts to rise above 30% with the

6

approval of the Finance Director . . . ." Id. ¶ 130. There is no indication that this practice was ever disclosed to the market during the Class Period.

Investors reacted negatively to the October 5, 2010 announcements. The following day, Equinix's stock price fell from $106.09 on October 5 to $70.34, a one-day loss of over 33 percent of shareholder equity. Id. ¶ 177.

**B.  Procedural History**

Cement Masons, which had purchased Equinix stock during the Class Period, filed the instant action in federal court on March 4, 2011. ECF No. 1 ("Compl."). IBEW, another Equinix stockholder that is represented by the same counsel as Cement Masons, was appointed as lead plaintiff on August 8, 2011. ECF No. 23 ("Aug. 8, 2011 Order"). The FAC was filed about six weeks later, asserting causes of action for (1) violations of Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act") and of United States Securities and Exchange Commission ("SEC") Rule 10b-5; and (2) violations of Section 20(a) of the Exchange Act. Mar. 2 Order at 6. The crux of the FAC was that Defendants made a number of false and misleading statements concerning: (1) Equinix's financial forecasts for 3Q10 and FY10; (2) Equinix's pricing strategy; (3) the integration of Switch and Data's sales force; and (4) Equinix's ability to provide accurate financial forecasts. Id.

On March 4, 2012, the Court granted Defendants' motion to dismiss the FAC, but granted Plaintiffs leave to amend their complaint. The Court found that Equinix's financial forecasts were not actionable because they fell under the safe harbor for forward-looking statements set out in the Private Securities Litigation

7

Reform Act ("PSLRA"). FAC Order at 13. The Court also found that Plaintiffs failed to adequately plead the falsity of Defendants' statements concerning Equinix's pricing strategy and the integration of the Switch and Data sales force. Id. at 15. Specifically, the Court held that "Defendants maintained a consistent position on pricing throughout the class period." Id. at 14.

Plaintiffs filed their SAC on May 2, 2012. Like the FAC, the SAC alleged that Defendants made false and misleading statements concerning Equinix's pricing strategy and the integration of Switch and Data. However, Plaintiffs no longer alleged that the July 28, 2010 financial forecasts for 3Q10 and FY10 were actionably false. SAC ¶ 10 n.2. The SAC included allegations from five CWs, including the former regional director discussed above. The Court dismissed the SAC with leave to amend, once again finding that Plaintiffs had failed to allege falsity of the statements concerning the Switch and Data integration and Defendants' pricing strategy. The Court also found that Plaintiffs had failed to allege loss causation as to the CW allegations, reasoning: "The only public disclosures alleged by Plaintiffs occurred on October 5, and those disclosures merely revealed that Equinix had offered 10 percent discounts to certain 'magnet customers.'" SAC Order at 18. Because the widespread discounting described by the CW was not revealed to the market during the Class Period, it could not have caused Equinix's stock price to drop on October 6. Id. at 18-19.

The TAC attempts to revive Plaintiffs' allegations and legal theories concerning Defendants' financial forecasts and their statements regarding pricing and discounts. The factual

allegations in the TAC are more or less the same as those asserted in the FAC and the SAC.  Defendants now move to dismiss, arguing that the Court has already rejected the legal theories asserted in the TAC.

### III. LEGAL STANDARD

#### A. Motion to Dismiss

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988).  "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  The court's review is generally "limited to the complaint, materials incorporated into the complaint by reference, and matters of which the court may take judicial notice." Metzler Inv. GMBH v. Corinthian Colls., Inc., 540 F.3d 1049, 1061 (9th Cir. 2008) (citing Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)).

///

### B. Section 10(b)

Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe . . . ." 15 U.S.C. § 78j(b). One such rule prescribed by the SEC is Rule 10b-5, which states that "[i]t shall be unlawful for any person . . . [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(c). Plaintiffs must plead five elements to establish a violation of Rule 10b-5. Specifically, Plaintiffs must demonstrate "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." In re Daou Sys., 411 F.3d 1006, 1014 (9th Cir. 2005).

Plaintiffs must also meet the heightened pleading standards of Federal Rule of Civil Procedure 9(b) and the PSLRA, 15 U.S.C. § 78u-4. The PSLRA requires plaintiffs to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Additionally, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Id. § 78u-4(b)(2). The "required state of mind" for establishing securities fraud is the knowing, intentional, or deliberately reckless disclosure of false or misleading statements. See Daou, 411 F.3d at 1014-15. "The stricter standard for pleading

10

scienter naturally results in a stricter standard for pleading falsity, because falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, and the two requirements may be combined into a unitary inquiry under the PSLRA." Id. at 1015 (internal quotation marks omitted).

**IV. DISCUSSION**

   **A. Financial Forecast**

Plaintiffs' Section 10(b) claim is predicated in part on their allegation that Defendants' July 28, 2010 financial forecast was false. On July 28, Defendants forecast 3Q10 and FY10 revenue of $335 to $338 million and $1.225 and $1.235 billion, respectively. Later, on October 5, 2010, Defendants announced that they expected 3Q10 revenue of $328 to $330 million, a 2.2 percent reduction from the July 28 forecast, and FY10 revenue of $1.215 billion, a 1.2 percent reduction. Defendants admitted that the July 28 guidance failed to account for certain customer discounts.

Defendants argue that their July 28 forecasts are insulated by the PSLRA safe harbor for forward looking statements. MTD at 10. The PSLRA defines a forward-looking statement as "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items." 15 U.S.C. § 78u-5(i)(1). Such statements may fall within the safe harbor if: (A) they are "identified as forward-looking" and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement"; or (B) the

11

plaintiff fails to prove the projections were made with "actual knowledge" that they were false and misleading. Id. § 78u-5(c)(1)(A)-(B). "Thus, a defendant's state of mind is irrelevant if the challenged statements are identified as forward-looking and accompanied by meaningful cautionary language." FAC Order at 10 (citing In re Cutera Sec. Litig., 610 F.3d 1103, 1113 (9th Cir. 2010)).

Plaintiffs do not dispute that the July 28 forecasts constitute forward-looking statements, but they argue that the PSLRA safe harbor does not apply because the forecasts were not accompanied by meaningful cautionary language. Opp'n at 12. Specifically, they argue that Defendants' cautionary language did not warn that the July 28 forecasts may fail to account for known discounts and credit memos. Id. at 12-13. This same argument was addressed and rejected in the FAC Order:

> First, Equinix need not have warned of the exact risk that caused the company to miss its forecast. Second, the cautionary language in Equinix's SEC filings did warn of the possibility of pricing pressure and the dependence on magnet customers, factors which purportedly caused Equinix to offer discounts and settlements to its customers. The SEC filings also directly identified other risks that purportedly contributed to the revision of the revenue forecasts, including understatement of churn and lower than expected revenues from Switch and Data. Thus, taken together, Equinix's cautionary language warned of risks of a significance similar to those actually realized. Third, contrary to Plaintiffs' suggestion, it does not appear that Equinix's failure to account for customer discounts severely impacted its revenue forecasts, since Equinix's July 28 forecasts were only off by a few percentage points.

FAC Order at 12 (citations and quotations omitted). The Court declines to reach a different conclusion now.

///

12

1    Citing Cutera, Plaintiffs argue that they need not show that
2 Defendants had "actual knowledge" that their forecasts were false
3 because the actual knowledge requirement is triggered only where a
4 forward-looking statement is accompanied by meaningful cautionary
5 statements.  Opp'n at 13 n.6.  That is not the law.  The PSLRA
6 expressly states that a forward-looking statement falls under the
7 safe harbor if (1) the statement is identified as such and
8 accompanied by meaningful cautionary language, "or" (2) the
9 plaintiff fails to prove that the person making the statement had
10 "actual knowledge" of its falsity.  15 U.S.C. § 78u-5(c)(1)(A)-(B).
11 The disjunctive shows that either condition may trigger the safe
12 harbor.  Cutera does not hold otherwise.  In fact, Cutera expressly
13 rejected Plaintiffs' conjunctive reading of the safe harbor
14 provision, reasoning that "it ignores the plain language of the
15 statute."  610 F.3d at 1112.  Cutera did hold that a defendant's
16 state of mind may be "irrelevant" where a forward-looking statement
17 is accompanied by cautionary language because "the statement is not
18 actionable regardless of the plaintiff's showing of scienter."  Id.
19 Contrary to Plaintiffs' suggestion, the Ninth Circuit did not hold
20 that a plaintiff need not show actual knowledge where meaningful
21 cautionary language is absent.
22    The Court previously held that Plaintiffs failed to plead
23 sufficient facts to show that Defendants had actual knowledge that
24 the July 28 forecasts were false.  FAC Order at 12-13.  The TAC
25 offers no new facts on this issue.  Further, Plaintiffs' legal
26 theory remains the same: Defendants must have known that the July
27 28 forecasts failed to account for customer discounts because
28 Defendants approved some those discounts before they issued the

13

forecasts. Opp'n at 17-18. However, as the Court previously held, even if Defendants were aware of the discounts, there is no indication that they had actual knowledge that the forecast failed to account for them. FAC Order at 13. Plaintiffs have merely pled that Defendants touted their "exceptional visibility" into Equinix's financial model. TAC ¶ 103. This is a far cry from alleging that Defendants actually knew that they would not meet their revenue targets by a few percentage points.

For these reasons, the Court finds that Defendants' July 28 financial forecasts are not actionable under the PSLRA safe harbor for forward-looking statements.

### B.  Pricing and Discounts

The pricing allegations in the TAC look much like the pricing allegations in the FAC and SAC. Plaintiffs allege that Defendants falsely represented that their pricing was firm when they were actually providing their customers with steep discounts. The truth of the matter was allegedly revealed on October 5 when Defendants admitted that they had been providing discounts of up to 10 percent to certain "strategic" and "magnet" customers. Plaintiffs again allege that the discounts were even steeper than 10 percent, asserting that a former regional director of sales states that she regularly approved discounts of between 10 and 30 percent.

The Court previously rejected these allegations, concluding that Defendants statements about pricing remained consistent throughout the class period. As early as July 28, Defendants conceded that they might offer discounts to strategic customers. Plaintiffs now argue that these statements, including Smith's statement that Equinix might face pricing pressure, "indicate an

14

expectation of the future, and do[] not intimate that the pricing pressure had already resulted in discounts . . . ." Opp'n at 10. Defendants respond that, when viewed in context, it is clear that Smith was not discussing the conditions under which Equinix was offering discounts. Reply at 8-9.

The Court agrees with Defendants. The full text of Smith's July 28 statement concerning pricing competition, which is attached to the TAC, shows that Smith was referring to discounts that had been offered in the past, as well as discounts that might be offered in the future:

> On the competitive front it does vary by metro, by market. I would tell you in the US the statement you made is we're seeing a little bit of that in the LA market. And I think because of the demand -- or the competitive supply that we see in Phoenix and Vegas and also in the LA market, so there are certain markets where certain pressure -- pricing pressure and pricing behaviors are going to change, but that's not terribly different than what we've experienced over several quarters. And so in certain markets we're going to get some pricing pressure on certain deals. If it's a strategic deal and it's a magnetic deal for us, we'll get more aggressive. If it's not, we're going to let it go and whether it goes to a competitive retail or a wholesale business, so be it. We're maintaining the discipline on the floors and ceilings we have on our pricing and the sales force is staying very, very disciplined on price. So I wouldn't tell you it's in very many markets, it's in a couple of places and on a couple of deals where we're seeing this as you called it pricing behavior get a little goofy.
>
> In terms of deal sizes, as we open up a new phase or a new IBX in particular, we tend to follow the same formula that we've done in the past. We'll put -- if we have an anchor that's magnetic like or that's at -- that's going to get it jump started for us in the right vertical, we will tend to do a larger deal that's anchor like to get the IBX jump started. But in general, when a deal gets to a certain size, call it 250, 300, 400 KW of power, call it a quarter to a half a megawatt of power, it tends to get more crowded in terms of competition. And if it is a strategic deal,

> we might hang in there for a while. If it's not, we're going to let it go to the wholesale or to the competitors.

TAC Ex. D at 10. While Smith's statements might be cryptic, they are not false or misleading.

In the SAC Order, the Court also held that Plaintiffs' CW allegations, which assert that Defendants routinely offered discounts of 10 to 30 percent during the class period, could not support a claim for securities fraud. The Court reasoned that Plaintiffs had failed to plead loss causation because these discounts were never disclosed to the market during the class period. SAC Order at 18-19. The TAC does not cure this deficiency. Plaintiffs still do not allege how the market could have reacted to widespread discounting of which it was not aware. Plaintiffs concede the point in their opposition brief, arguing that Equinix stock dropped on October 6 because Equinix revised its revenue guidance. Opp'n at 24-25.

The Court finds that Plaintiffs' pricing allegations cannot support a claim for securities fraud. For these reasons and the reasons set forth in Section IV.A, Plaintiffs Section 10(b) claim is DISMISSED.[3]

### C. Plaintiffs' Section 20(a) Claim

Absent an underlying violation of the Exchange Act, there can be no control person liability under Section 20(a). Paracor Fin., Inc. v. Gen. Elec. Capital Corp., 96 F.3d 1151, 1161 (9th Cir. 1996). Because Plaintiffs have not pled a violation of Section

---

[3] Defendants also argue that Plaintiffs have failed to plead scienter. As Plaintiffs have failed to plead other necessary elements of a Section 10(b) claim, the Court need not and does not address this issue.

16

10(b), their control person claim is also DISMISSED.  See Shurkin v. Golden State Vinters, Inc., 471 F. Supp. 2d 998, 1027 (N.D. Cal. 2006), aff'd 303 Fed. Appx. 431 (9th Cir. 2008).

### D. Leave to Amend

Plaintiffs have requested leave to amend to satisfy the pleading requirements of the PSLRA.  Leave to amend should be freely given when justice so requires.  Fed. R. Civ. P. 15(a)(2).  However, Plaintiffs have already had three opportunities to amend their pleading, and the TAC merely reasserts factual allegations and legal theories that have already been rejected by the Court.  The result is that Plaintiffs and the Court are now repeating themselves.  Further, Plaintiffs have not identified any new facts that they could allege in a fourth amended complaint.  Accordingly, this matter is DISMISSED WITH PREJUDICE.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants Equinix, Inc., Stephen M. Smith, and Keith Taylor's Motion to Dismiss.  Plaintiffs Cement Masons & Plasterers Joint Pension Trust and the International Brotherhood of Electrical Workers Local 697 Pension Fund's action is DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

Dated: June 12, 2013

UNITED STATES DISTRICT JUDGE